```
                                                                    1

              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - -     X

UNITED STATES OF AMERICA,     :    10 CR 019

                              :

     -against-                :
                                   United States Courthouse
                                   Brooklyn, New York
ADIS MEDUNJANIN,              :

                                   March 22, 2011
          Defendant.          :    12:00 o'clock noon

- - - - - - - - - - - - -     X


              TRANSCRIPT OF CONFERENCE
         BEFORE THE HONORABLE RAYMOND J. DEARIE
         CHIEF UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          LORETTA E. LYNCH
                             United States Attorney
                         BY: DAVID BITKOWER
                             JAMES LOONAM
                             BERIT BERGER
                             Assistant United States Attorneys
                             271 Cadman Plaza East
                             Brooklyn, New York


For the Defendant:           ROBERT GOTTLIEB, ESQ.
                             CELIA GORDON, ESQ.
                             STEPHANIE CARVLIN, ESQ.
                             MITCHELL DINNERSTEIN, ESQ.
```

            GR     OCR     CM     CRR     CSR

2

```
 1
 2   Court Reporter:         Gene Rudolph
                             225 Cadman Plaza East
 3                           Brooklyn, New York
                             (718) 613-2538
 4
 5   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription. THE COURT:  Welcome
 6   back.
 7
 8
 9
10                              *****
11
12
13           MR. BITKOWER:  Thank you, Your Honor.
14           MR. GOTTLIEB:  Thank you for having us.
15           THE CLERK:  We are on this afternoon for a status
16   conference.  This is USA versus Medunjanin, docket number
17   CR 10-019.
18           Can I ask the attorneys please to note their
19   appearance, beginning with counsel for government.
20           MR. BITKOWER:  For the government, David Bitkower
21   and James Loonam.
22           Good afternoon, Your Honor.
23           THE COURT:  Good afternoon.
24           MR. BITKOWER:  And Berit Berger will be joining us
25   momentarily as well.
```

GR        OCR        CM        CRR        CSR

1        MR. GOTTLIEB:  Robert Gottlieb for Mr. Medunjanin,
2 Your Honor.
3        Good afternoon.
4        THE COURT:  Good afternoon.
5        MS. GORDON:  Celia Gordon also for Mr. Medunjanin.
6        THE COURT:  Ms. Gordon.
7        MR. DINNERSTEIN:  And Mitchell Dinnerstein also for
8 Mr. Medunjanin.
9        THE COURT:  Good afternoon.
10       Welcome back.
11       MR. GOTTLIEB:  Your Honor, we have Stephanie Carvlin
12 on the phone.
13       THE COURT:  All right.
14       MS. CARVLIN:  Yes, Your Honor.
15       THE CLERK:  Ms. Carvlin, can you hear us all?
16       MS. CARVLIN:  Yes, I can.
17       Thank you.
18       THE COURT:  The issue before the Court today, as I
19 understand it, is the possible testimony of AUSA Knox.  I have
20 been favored with a number of letters, including overnight, on
21 the subject.
22       Ms. Berger is now with us.
23       Is there anything anybody wants to add to all of
24 this?
25       MR. BITKOWER:  Not for the government, Your Honor.

4

1  MR. GOTTLIEB: Your Honor, with your permission,
2  Ms. Carvlin is prepared to address any issues, certainly would
3  be the person to kick it off, if you thought further
4  discussion would be helpful.
5  THE COURT: You know, I don't, only because you have
6  been very thorough in these presentations. I for one
7  remain -- I realize the government has left open a question as
8  to whether or not they will assert a privilege with respect to
9  certain information. Separate and apart from that, I am
10 unconvinced that testimony of AUSA Knox will add anything to
11 this discussion. We had well tried legal issues before me.
12 The one fact that is I guess relevant to the
13 question at all, of course, is not in dispute concerning
14 Mr. Gottlieb's retention and his communication of this fact to
15 the government as early as September. Yes, it may be in a
16 sense, and it does read to some extent as a discovery
17 mechanism. I am not as concerned about that as the fact that
18 I don't see any material information coming to me that bears
19 on the issues of Mr. Medunjanin's alleged or possible waiver
20 of his Fifth Amendment rights once he was arrested.
21 I assume that given the bizarre state of affairs
22 that transpired that January evening or afternoon, of course,
23 there is going to be discussions between attorneys and clients
24 on both sides of the aisle. No one on the law enforcement
25 side expected Mr. Medunjanin to take the action he took.

1  Obviously, there is going to be a discussion, as indeed we've
2  had some testimony, about what to do with him and whether he
3  could be spoken to and so forth and so on.
4        With all due respect, I don't think an Assistant
5  U.S. Attorney, Mr. Knox or anyone else, decides whether or not
6  the action taken by the authorities in approaching
7  Mr. Medunjanin, engaging him in conversation, administering
8  warnings, taking waivers, whether that is kosher; that's my
9  job.  So I assume there is all sorts of back and forth between
10 Assistants, whether it's Mr. Knox or others, and the agents
11 about what to do in the wake of this rather bizarre incident.
12        I don't know that it speaks to the issue before me.
13 In fact, the more I think about it, the less I am inclined to
14 think it has any bearing whatsoever.
15        There is also something to the privilege -- I am
16 glad we are sort of past the Touhy business.  I quite agree
17 with Ms. Carvlin's comment the last time, that if it were a
18 question of depriving the defense of relevant and material
19 testimony in a criminal setting -- and the courts of appeals
20 that have spoken on this apply these regulations in a criminal
21 setting -- there is no doubt in my mind that those regulations
22 would give way, were that the situation, if there were
23 relevant material information that we could glean from the
24 testimony of this witness.  I don't think Touhy would stand in
25 the way.  I don't see it.

1           The question is framed rather squarely.  Fully
2   knowing that Mr. Medunjanin was represented by counsel, the
3   agents approached Mr. Medunjanin who appeared to be willing,
4   if not anxious, to speak to them.
5           I am not going to go into the substance of what was
6   said at the time because you've all asked for an opportunity
7   to do further briefing.  Although, I must say, I don't know
8   what more briefing we can do on the point.
9           The question is, was that waiver knowing and
10  voluntary?  If it was, that ends the discussion.
11          The idea of giving license to the defense to call an
12  Assistant U.S. Attorney, frankly, in the hopes that some jewel
13  might fall in their laps, lending credence to a claim -- and I
14  emphasize the word "claim" -- of outrageous government
15  conduct, because there has been no such evidence of outrageous
16  government conduct, in my view, I don't think justifies
17  throwing somebody up on the witness stand in the setting of
18  this case.
19          That's my view of it.  I will amplify it in my
20  written opinion.
21          MS. CARVLIN:  If I can just respond briefly?  I
22  understand Your Honor's ruling.
23          I just want to make clear that what we'd be calling,
24  or attempting to call Assistant U.S. Attorney Knox to testify
25  to is not just with respect to the waiver with respect to our

1  other arguments about government misconduct, potential
2  government misconduct here.  Certainly it's absolutely true
3  that it's the Court's decision or the Court's obligation to
4  decide what happened here.  We are not disputing that.  In
5  fact, we are encouraging that.
6            I am asserting that you need all of the facts in
7  order to make that decision.  And, as we have outlined, there
8  are some facts that only with respect to not the waiver
9  argument but the outrageous government conduct argument, the
10 right to counsel argument, that only the United States
11 Attorney Knox could provide.
12           THE COURT:  I disagree.  I think we have the
13 evidence we need in the record.
14           To the extent that there is any currency in the
15 argument that Mr. Knox could offer relevant evidence on the
16 question, I have thought about it and thought about it and
17 thought about it.  Mr. Gottlieb did what a good lawyer does.
18 He communicated the fact of his representation to the
19 government early on, as a legal point.  I don't know that
20 there is any authority, in fact as I understand the
21 authorities, it doesn't suggest that there can't be a valid
22 Fifth Amendment waiver following a period of incarceration.
23           You make, I know, a series of sort of satellite
24 arguments to the extent that various communications between
25 Mr. Medunjanin and Mr. Gottlieb over the phone were tantamount

8

1  to an assertion of the Fifth Amendment right, Sixth Amendment
2  right.  I understand the argument.  We will deal with them in
3  turn.
4          I don't see anything to be gained from the testimony
5  of Mr. Knox.  As I said, we will talk more about it later.
6          The question is, where do we go from here?
7          MR. GOTTLIEB:  Your Honor, on this same issue?
8          THE COURT:  Yes.
9          MR. GOTTLIEB:  With the Court's permission.
10         For example, just before we came into the courtroom
11 today, I was handed a number of emails from Agent Azad, I
12 believe, in one and another agent to Assistant U.S. Attorney
13 Knox going back to September 25, 2009 regarding my contacts
14 with the government, emails that then continue into January.
15         I think what Ms. Carvlin is getting to, and much
16 better than I could as a matter -- in a legal argument, but
17 only by calling a live witness under our system -- this is our
18 view of it -- only by calling a live witness to put more meat
19 on the bones if we are alleging -- it is an issue that
20 ultimately Your Honor is going to have to find, one way or the
21 other -- alleging that in light of all the circumstances, in
22 light of the conversations with Mr. Knox, because we put in
23 our proffer in our letter, it is not only that I am putting
24 him on notice but then Mr. Knox responded to me in September
25 of 2009 about what the government was representing they would

1  do as a result of my representation, and that being that they
2  would not question my client.
3          So it is not enough just to say that I called and
4  the government therefore was put on notice.  But if we are
5  really going to grapple with and understand the defense
6  argument that there was outrageous government conduct here,
7  wouldn't it be appropriate to hear what in fact the
8  government's response was, what the government's
9  representations were to me.  And on January 7th, when we were
10 desperately trying to find Mr. Medunjanin, was there, at best,
11 a conscious avoidance by the government not to make contact
12 with me, knowing that I am placing calls.  As a maxim of
13 federal law, conscious avoidance is heard constantly.  It is
14 not an absolute shield under all circumstances.
15         So if the government goes out of its way to avoid
16 recognizing my request, insistence that he not be questioned
17 on January 7th, wouldn't that fact, wouldn't all the history
18 of it, wouldn't that be relevant in considering whether or not
19 under all the circumstances of this case, knowing the back and
20 forth, that can only come out through cross-examination from
21 questioning a witness who is relevant.
22         We are not asking to call the President of the
23 United States.  We are not asking to call Mr. Holder or the
24 US Attorney here in Eastern District.
25         We are asking to call, be permitted to call, a

1  witness who had all of those conversations directly with me,
2  and that is the process by which we have accepted that the
3  truth best can be brought out in a courtroom, through
4  examination.
5              THE COURT:  I don't know that any of the substance
6  of these conversations as you relate them is in dispute.
7  What's in dispute?
8              MR. GOTTLIEB:  If there was --
9              THE COURT:  What meat don't you have on the bone
10 that we have already in the record?
11             MR. GOTTLIEB:  Is the government prepared to
12 stipulate that there was conscious avoidance knowing that I
13 was -- no.  I am not saying that sarcastically.  Because
14 that's exactly why we do have to call the witness.  If the
15 government was willing to say Mr. Knox knew that I was
16 calling, spoke to an agent and said I am not going to return
17 the phone call.  Guys, do what you have to do.  I don't know
18 if that's what happened.
19             But knowing that I was calling, it is not a fishing
20 expedition to go into what -- we know there were conversations
21 between Mr. Knox and Agent Azad and perhaps others.  So it is
22 not a fishing expedition to now in the context of this hearing
23 to elicit what were you told and what did you tell them
24 regarding representation, whether or not to make contact with
25 me.

11

1  Then we added, in our last submission, this issue of
2  the CJA appointment. I know in the response that I just saw
3  that apparently was sent to us close to midnight last night,
4  but I just quickly looked at it, on January 7th, the day in
5  question, after spending all day trying to get Mr. Knox, I
6  receive a call from Mr. Knox late at night while I'm having
7  dinner saying that he is --

8  MR. LOONAM: The eighth.

9  MR. GOTTLIEB: January 8th. I'm sorry. It would be
10 January 8th, indicating that he's making plans to have a CJA
11 attorney present at the arraignment tomorrow, which was going
12 to be Saturday, and this is after the government is now
13 informed by my client that he wishes to be represented by me.

14 So to have a full picture, so we could have a clear
15 factual picture of everything that happened, why things were
16 happening, why they were making efforts to get another
17 attorney even after being told by Mr. Medunjanin he wanted me
18 to represent him, in order to make that determination, Your
19 Honor, as to whether or not the contact adds up to
20 inappropriate outrageous conduct which would warrant a remedy,
21 it's only by having that back and forth in the direct and
22 cross-examination.

23 THE COURT: All well and good. I am not going to
24 debate it with you.

25 You do raise a couple of interesting points. One is

1  remedy.  Assuming there were any factual bases to suspect,
2  much less find, outrageous government conduct, query, what the
3  remedy would be that you would be entitled to.  I don't know
4  that it would be suppression of these statements.
5         Secondly, you segue into areas that are really the
6  focus of the principal legal issue.  But as long as you do, I
7  found credible the statement that Mr. Medunjanin at one point
8  expressed dissatisfaction with counsel.  I am not suggesting
9  for a moment he had any objective justification for that, not
10 at all.  But consider this.  He had paid a fee.  A period of
11 time, not much had elapsed.  There had been no arrests from
12 his perspective.  There will be a number of phone calls back
13 and forth.  There had been no meetings.  And the retainer had
14 been dissipated.  Probably a pejorative connotation to that
15 word.  The retainer had been used up and now he's getting
16 billed for additional monies.
17        We all know from our experience as practitioners how
18 lay people sometimes react to legal bills and don't fully
19 comprehend the value of our time or how much time we take
20 along the way.
21        To me that made perfectly good sense.  Because of
22 that, and his expression of not wanting Mr. Gottlieb, which
23 obviously later on he apparently about faced, he checked the
24 box, I would have done the same thing, had CJA counsel
25 standing by for an arraignment.  The mere fact that they

13

maintain that position after the fact that he finally stated that he wished to speak with counsel is to me utterly immaterial.

As I said, the debate is over what do we do now? Where are we going?

Do you really need time to brief these issues?

MS. CARVLIN: Yes, Judge. I think we would like a briefing schedule. Obviously, I believe there is evidence in the record that may persuade Your Honor that fact -- --

THE COURT: I'm sorry. Say that again, please.

MS. CARVLIN: Yes.

I am saying, I think you do need a briefing schedule, Your Honor. I want to be able to point out evidence in the record supported by legal argument. As you say, this is not the time to get into the substance of the argument.

What I would suggest is it is time to set a briefing schedule.

THE COURT: I want to set a very tight briefing schedule. All of this is so fresh in my mind, I think all the relevant cases have been identified, perhaps not folded within the record. I understand your point. I will give you some time.

Ellie, where are we?

Can you get it in by April 1st?

THE CLERK: April 1st?

1    MS. CARVLIN:  Is this going to be simultaneous, Your
2    Honor?
3    THE COURT:  No.  Your motion, you make your
4    submission.  The government will respond and I will give you
5    an opportunity for a very brief reply.
6    MS. CARVLIN:  How about April 4th?  That would give
7    me an extra weekend.
8    THE COURT:  I knew you were going to say that.
9    April 4th.  April 4th.
10   And Mr. Bitkower?
11   MR. BITKOWER:  April 11th.
12   THE COURT:  April 11th.  Any reply, April 15th, tax
13   day.
14   MR. GOTTLIEB:  Your Honor, one request.  In light of
15   the decision that we are not going to be permitted to elicit
16   certain information that we thought, quite frankly, we were
17   going to be able to obtain from Mr. Knox, the --
18   THE COURT:  I am getting paid to disappoint somebody
19   every day, Mr. Gottlieb.
20   Go ahead.
21   MR. GOTTLIEB:  And you have earned your fee, Your
22   Honor, believe me.
23   THE COURT:  Thank you.
24   MR. GOTTLIEB:  Would Your Honor --
25   THE COURT:  Did you say fee?

15

1   MR. GOTTLIEB: The pay, the pay.
2   THE COURT: Oh.
3   MR. GOTTLIEB: I will speak as an attorney.
4   THE COURT: I got excited there for a moment.
5   MR. GOTTLIEB: Would Your Honor permit a
6   supplemental affidavit from me, specifically on the issue that
7   was raised with regard to CJA, to complete the record here?
8   THE COURT: Fire away.
9   MR. GOTTLIEB: If I -- if I can be permitted to add,
10  that we will at least be able to supplement to a certain
11  degree the record as we think is appropriate.
12  THE COURT: You have my permission.
13  MR. GOTTLIEB: Thank you.
14  MR. BITKOWER: Just to add very briefly to that, the
15  fact that we believe certain facts aren't legally relevant, I
16  just want to make clear on the public record, does not
17  indicate that we are agreeing with all of his representations.
18  Obviously, there are steps that we took which we are
19  comfortable with ethically and legally. There are certain
20  allegations that may be made in an affidavit that we may or
21  may not agree with. The fact that we choose to respond or not
22  respond should indicate our lack of belief in their legal
23  relevance but not necessarily adopting them as correct.
24  THE COURT: All right, sir.
25  When I get the briefs I will be back to you with a

1  ruling as quickly as possible.
2           Thank you and good day.
3           MR. GOTTLIEB:  Thank you.
4           (Matter concludes.)

GR        OCR        CM        CRR        CSR