

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

RMT:DMP
F. #2009R01793

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 6, 2018

**Redacted for Public Filing**

The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Zarein Ahmedzay
                 Criminal Docket No. 10-019 (S-1) (RJD)

Dear Judge Dearie:

      The government respectfully submits this letter in advance of the defendant Zarein Ahmedzay's sentencing by the Court, which is currently scheduled for Decemder 14, 2018, at 11 a.m. The purpose of this letter is to describe the offense conduct and applicable United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") calculations, and to move pursuant to Section 5K1.1 of the Guidelines to allow the Court in its discretion to depart below the applicable advisory Guidelines range based upon the substantial assistance provided by the defendant.

I.        Offense Conduct[1]

      On April 23, 2010, Ahmedzay pleaded guilty before the Honorable Steven M. Gold, pursuant to a cooperation agreement, to conspiracy to use a weapon of mass destruction against persons and property within the United States, in violation of Title 18,

---

[1] The offense conduct set forth below is drawn from the Presentence Investigation Report ("PSR") and from the defendant's testimony at three trials in the Eastern District of New York, as described in more detail below.

United States Code, Section 2332a; conspiracy to commit murder in a foreign country, in violation of Title 18, United States Code, Section 956; and providing and conspiring to provide material support and resources to al-Qaeda, in violation of Title 18, United States Code, Section 2339B. The government agrees with the detailed description of the offense conduct set forth in the Presentence Investigation Report ("PSR").

In summary, Ahmedzay traveled with two other individuals from the United States to Pakistan in 2008 to wage jihad (violent struggle) against American and coalition forces in Afghanistan. While in Pakistan, Ahmedzay and his co-conspirators joined al-Qaeda, received training in weapons and explosives, and agreed to conduct a terrorist attack in New York City. After returning to the United States, Ahmedzay and his co-conspirators planned to carry out a suicide bombing attack on the New York City subway system.

    A.    <u>Ahmedzay's Path to Radicalization</u>

Ahmedzay was born in the border regions of Pakistan and Afghanistan, and moved to Queens, New York, when he was approximately eight years old. He grew up in Queens, attended high school in Flushing, Queens, and then spent three years studying education and biology at Queens College before dropping out in May 2007. After dropping out, Ahmedzay worked full-time as a New York City taxi driver, which he had done on a part-time basis since 2005.

Ahmedzay was first introduced to a radicalized version of Islam in 2006, after he was assaulted for no apparent reason by someone he had previously considered a friend. Ahmedzay was trying to figure out how to deal with the situation and how to exact revenge when another friend, Adis Medunjanin, advised Ahmedzay not to worry about people like the one who had assaulted him, but instead to dedicate his life to Allah. Medunjanin provided Ahmedzay with audio tapes of lectures by Sheikh Anwar al-Awlaki and Sheikh Abdullah Faisal,[2] which Ahmedzay listened to along with Medunjanin and another friend, Najibullah Zazi. As a result of listening to these tapes, Ahmedzay, Medunjanin and Zazi came to believe that being a true Muslim involved not just praying and studying the Qu'ran but participating in jihad and fighting to defend Muslims who were oppressed in Iraq and Afghanistan. Moreover, Ahmedzay also came to believe that he was under a personal duty to fight to defend Muslims against American forces in Iraq and Afghanistan.

---

[2] Al-Awlaki, who is now-deceased, was a Yemeni-American imam who rose to become a leader of al-Qaeda in the Arabian Peninsula. Faisal was a Jamaican preacher who was convicted in the United Kingdom on charges including soliciting murder.

During the summer of 2008, Ahmedzay, Medunjanin and Zazi made what they called a "covenant," or agreement, to travel together to Pakistan with the goal of joining the Taliban and fighting violent jihad against American and coalition troops in Afghanistan. In a meeting outside a mosque in Flushing, New York, the three men made an oath to fight alongside the Taliban mujahideen (holy warriors) and kill American soldiers. They agreed that they would seek "victory or shehadeh" (martyrdom), i.e., defeating American forces in Afghanistan or dying in the process. They agreed on a cover story that Zazi and Ahmedzay were planning to visit their families in Pakistan and Afghanistan, respectively, while Medunjanin was traveling to Pakistan to find a wife.

On August 28, 2008, Ahmedzay, Medunjanin and Zazi traveled from Newark Liberty International Airport in Newark, New Jersey to Peshawar, Pakistan.

### B.   Ahmedzay Joins al-Qaeda

While in Pakistan, Ahmedzay and Medunjanin unsuccessfully attempted to travel across the border to Afghanistan to join the Taliban, while Zazi stayed with his relatives in Peshawar, having planned to join Ahmedzay and Medunjanin in Afghanistan later. Ahmedzay and Medunjanin tried to cross the border by taxi, however, they were questioned by Pakistani police at a checkpoint and taken to a police station because the police apparently believed that Medunjanin was an American spy and Ahmedzay was his translator. Ahmedzay was able to convince the police that he and Medunjanin were Muslim, and they were released.

Ahmedzay, Medunjanin and Zazi then sought assistance at a Peshawar mosque, where they spoke to a Taliban recruiter who stated that he had helped John Walker Lindh join the Taliban. Lindh is a U.S. citizen who was captured as an enemy combatant during the U.S. invasion of Afghanistan in 2001. Ahmedzay, Medunjanin and Zazi arranged to go with the recruiter the next day to join the Taliban. However, the recruiter did not return to pick them up.

Ahmedzay, Medunjanin and Zazi ultimately traveled with a second individual that they had met through the mosque, an al-Qaeda facilitator named "Ahmad." Ahmad informed the men that he could help them obtain training to be "fighters," and he took them to an al-Qaeda training compound in Waziristan, which is in the Federally Administered Tribal Areas (FATA) on the border of Pakistan and Afghanistan. Before they arrived at the compound, Ahmad took the men to a guesthouse in Miram Shah in North Waziristan, where they met with senior al-Qaeda leaders they knew as "Abdul Hafeez" (later identified as al-Qaeda external operations chief Saleh al-Somali) and "Ibrahim" (later identified as British and Pakistani al-Qaeda external operations operative Rashid Rauf). Abdul Hafeez and Ibrahim encouraged Ahmedzay, Medunjanin and Zazi to return to the United States to

conduct a martyrdom operation – that is, a suicide bombing attack – rather than remain to fight on the battlefield in Afghanistan. Ahmedzay, Medunjanin and Zazi initially told the al-Qaeda leaders that they were not interested in returning to the United States, reaffirming their desire to fight against American and coalition forces in Afghanistan. They agreed, however, to keep an open mind.

  C.  <u>Ahmedzay Receives al-Qaeda Training</u>

  Ahmedzay, Medunjanin and Zazi were eventually taken to an al-Qaeda training compound. At the compound, the three men met additional al-Qaeda operatives, including "Hamad" (later identified as Adnan el-Shukrijumah, an al-Qaeda operative who spent time in the United States), who provided them with basic explosives training, and "Yousef" (later identified as Canadian citizen Ferid Imam), who provided them with military weapons training. During their time at the compound, which lasted approximately one to two weeks, the three men received training on both light and heavy weaponry, including AK-47s, handguns, PK machine guns and rocket propelled grenades. Their training included instruction on how to use, assemble, dismantle and clean the weapons. The al-Qaeda trainers also taught them how to identify the weapons in Arabic so they would be able to better communicate with other fighters during combat in Afghanistan. The training included hands-on training with the weapons, and each of the three men were in regular possession of these weapons. Near the end of their training, the three men each had the opportunity to fire the weapons on which they had received training. The al-Qaeda trainers took them to a firing range and each fired the firearms and the rocket launchers and threw the grenades.

  During their time at the training compound, Ahmedzay, Medunjanin and Zazi also received basic explosives training from Hamad.

  During the training, Ahmedzay, Medunjanin and Zazi continued to have discussions with Abdul Hafeez and other al-Qaeda leaders about conducting a martyrdom operation in the United States. Hamad showed the men videos produced by as-Sahab, the media wing of al-Qaeda, about past suicide bombings al-Qaeda had conducted, including videos about the 2005 London subway bombings. In one-on-one conversations, Hamad asked Ahmedzay to propose potential targets in New York City, and suggested that the men hit those targets with car bombs. However, Hamad said that even a simple attack would be a success and it did not need to be spectacular. Ultimately, after further discussions with Hamad and Abdul Hafeez, Ahmedzay, Medunjanin and Zazi agreed that they would not stay to fight in Afghanistan, but would instead return to the United States to conduct a suicide attack.

  Following the conclusion of the weapons training, Medunjanin returned to the United States in September 2008 because he had a short-term Pakistani visa that was

expiring. Ahmedzay and Zazi each went to visit their families in Afghanistan and Pakistan, respectively, agreeing that they would return to Waziristan one month later for more detailed explosives training.

Ahmedzay then visited his wife and daughter in Afghanistan. During his time with his wife, he told her about the training he had taken and that he intended to return for further training. Ahmedzay's wife became angry with him and told him that he would have to choose between jihad and his family. Ahmedzay's wife told him that if he returned to jihad, she would kill herself and their daughter. Ahmedzay ultimately decided not to return to jihad. As a result, he did not return to Waziristan for the explosives training course. Rather, he intended to return to the United States to further his education and start a business.

Although Ahmedzay did not join him, Zazi attended an additional al-Qaeda training session at a different compound in Waziristan on how to construct improvised explosive devices. In late 2008, Ahmedzay and Zazi met in Peshawar, Pakistan. Zazi described for Ahmedzay the explosives training that he had taken, and showed Ahmedzay a notebook in which Zazi had taken notes about how to build explosives, including how to make a car bomb. Zazi and Ahmedzay returned to the United States separately in January 2009.

D.   Ahmedzay Recommits to an Attack

Shortly after returning to the United States, Zazi moved to Colorado, while Ahmedzay and Medunjanin remained in New York. Ahmedzay saw Medunjanin at Queens College, and told Medunjanin about what had happened between Ahmedzay and his wife. Medunjanin was not happy with Ahmedzay and reminded Ahmedzay of his agreement to carry out an attack with Medunjanin and Zazi. During this time period, Ahmedzay continued to listen to and be inspired by the lectures of Anwar al-Awlaki, and ultimately remotivated himself to participate in a terror attack on U.S. soil.

E.   Planning an Attack in New York City

In late Spring of 2009, Ahmedzay, Medunjanin and Zazi met in New York City and agreed to conduct a coordinated suicide bombing attack during Ramadan, or in approximately September 2009. Zazi told the others that he would try to build a car bomb and, depending on whether he was able to do that, they could determine their plan.

During the summer of 2009, Zazi reviewed his handwritten notes from his al-Qaeda explosives training, and began purchasing the chemical components needed to make a bomb, including acetone, hydrogen peroxide and hydrochloric acid, as well as other supplies. However, one of Zazi's relatives discovered these supplies and confronted him, leading Zazi to discard most of the materials.

5

In August 2009, Zazi advised Ahmedzay that he was unable to make a car bomb but that he could make a suicide vest. As a result, Ahmedzay and Zazi changed their initial plan from a car bomb attack to a subway attack where they would each wear a suicide vest. Ahmedzay then informed Medunjanin of the change in plans.

Zazi returned to Colorado, where he again bought the ingredients need to construct the bomb. Instead of keeping these materials in a house where he was living with relatives, Zazi kept the materials in his car and in a storage room. On August 28 and 29, 2009, Zazi rented a hotel room, where he worked on making the proper mixture of chemicals for the bomb. Once successful, Zazi brought the acetone peroxide mixture (commonly referred to as TATP, for triacetone triperoxide) back to his residence. Zazi tested a small sample to make sure that the mixture worked properly. He then created more of the mixture so that he had enough of the mixture to make three bombs: one for Ahmedzay, one for Medunjanin and one for himself.

In or about early September 2009, Zazi was contacted by Ahmad, the group's primary al-Qaeda contact. By email, Zazi informed Ahmad, in coded terms they had previously discussed in Pakistan, that the suicide operation was ready to proceed, and sought the precise instructions for constructing one of the improvised explosives Zazi had been taught to make in Pakistan. As noted above, Zazi had already constructed a sufficient quantity of detonator explosive to assemble multiple improvised explosive devices for the attack.

On September 9, 2009, Zazi began driving to New York City with the detonator and other supplies necessary to build the explosive devices for the attack. Although the precise timing of the attacks had not been worked out, all three had agreed on the ultimate goal of detonating the bombs during suicide attacks in the New York City subway system.

    F.    <u>Aborting the Plan in the Wake of Law Enforcement Surveillance</u>

Zazi drove from Colorado to New York City, where he met Ahmedzay at Ahmedzay's house in Queens. Zazi showed Ahmedzay a small container of acetone peroxide, which Ahmedzay hid in his house. Zazi and Ahmedzay then drove to a local mosque. While driving to the mosque, Zazi and Ahmedzay spotted law enforcement surveillance. Zazi had previously been pulled over by law enforcement officers while crossing the George Washington Bridge en route from Colorado to New York. As a result, Zazi and Ahmedzay believed that they were under law enforcement surveillance and decided to abandon their subway bombing plot. When they arrived at the mosque, Zazi and Ahmedzay discarded the supplies for the bomb that were in Zazi's car. After returning

home, Ahmedzay also discarded the acetone peroxide that Zazi had given him by flushing it down a toilet.

On September 14, 2009, law enforcement officers executed a search warrant at Ahmedzay's house. During the search, Ahmedzay spoke with law enforcement agents, and lied by not telling them the truth about his travels in Pakistan. During a second interview on September 17, 2009, Ahmedzay again lied to law enforcement about his travels in Pakistan. Specifically, Ahmedzay told FBI agents that he had never traveled to an al-Qaeda training camp and did not know anyone who had received al-Qaeda military-type training.

On January 8, 2010, Ahmedzay was arrested and charged with making false statements to the FBI based on the false statements in these two interviews in September 2009. Ahmedzay was subsequently charged with the crimes in the instant indictment.

II.     The Statutory Scheme and Guidelines Calculation

Ahmedzay faces a sentence of up to life in prison on Counts One and Two, and a sentence of up to 15 years in prison on Count Three.[3]

The government agrees with the Guidelines calculation set forth in the PSR. With respect to Count One, the adjusted offense level is 54, based on a base offense level of 42 under Guidelines Section 2M6.1(a)(1) and a 12-level enhancement for a federal crime of terrorism under Guidelines Section 3A1.4(a). With respect to Count Two, the adjusted offense level is 45, based on a base offense level of 33 under Guidelines Section 2A1.5 and a 12-level enhancement for a federal crime of terrorism under Guidelines Section 3A1.4(a). With respect to Count Three, the adjusted offense level is 40, based on a base offense level of 26 under Guidelines Section 2M5.3(a), a two-level enhancement for providing funds and personnel with the intent that they be used to commit a violent act under Guidelines Section 2M5.3(b)(1), and a 12-level enhancement for a federal crime of terrorism under Guidelines Section 3A1.4(a).

Each of these counts are grouped together, pursuant to Guidelines Section 3D1.2(b), yielding a combined adjusted offense level of 54. Three levels are subtracted for Ahmedzay's acceptance of responsibility, yielding a total offense level of 51. However, the

---

[3] Since the defendant's conviction, the statutory maximum sentence for providing and conspiring to provide material support to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B, has increased from 15 to 20 years' imprisonment. However, the defendant is subject to the lower statutory maximum sentence because his conduct preceded the effective date of the sentence increase.

Guidelines provide that where the total offense level exceeds 43, the offense level should instead be treated as level 43.  Accordingly, the total offense level is 43.

Ahmedzay has no prior criminal history.  Although his criminal history category would therefore ordinarily be level I, the application of the terrorism enhancement places Ahmedzay in Criminal History Category VI.   Based on an offense level 43 and Criminal History Category VI, the advisory Guidelines range of imprisonment is life imprisonment.

III.     Legal Framework

In sentencing a defendant, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which provides "the starting point and the initial benchmark" for sentencing.  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).  Of course, a court is not bound to impose a Guidelines sentence.  See, e.g., United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (Guidelines provide the "starting point and the initial benchmark" for sentencing but are "truly advisory").  Instead, Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court also shall consider, among other things:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct; [and]
>>
>> (C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).  Ultimately, the sentence imposed should be "sufficient, but not greater than necessary, to comply with the purposes set forth in" subsection (a)(2), set forth above.

In addition, as relevant here, Section 5K1.1 of the Guidelines provides that a court may depart at sentencing from the applicable Guidelines range upon a motion by the government where the defendant "has provided substantial assistance in the investigation or prosecution of another person who has committed an offense." U.S.S.G. § 5K1.1.  It is left

8

to the discretion of the court to determine the extent of the departure, based upon the consideration of, among other things: (1) the court's evaluation of the significance and usefulness of the defendant's assistance; (2) the truthfulness and completeness of the defendant's information; (3) the nature and extent of the defendant's assistance; (4) any danger or risk of injury to the defendant arising from his assistance; and (5) the timeliness of the defendant's assistance.  See U.S.S.G. §§ 5K1.1(a)(1)-(5).

IV.     Substantial Assistance

Ahmedzay began cooperating with the government on April 12, 2010, and his cooperation has continued through the present.  Notably, although Ahmedzay initially lied to law enforcement officers when he was first questioned in September 2009, once he decided to cooperate in April 2010, he gave the government his full, complete cooperation.  He proffered at great length about every aspect of his conduct without minimizing his actions, nor were there any areas of questioning that Ahmedzay was reluctant to address.

Over the past eight years, Ahmedzay has provided extraordinary cooperation, meeting with the government more than 100 times, viewing hundreds of photographs, and providing information that assisted law enforcement officials in a number of different investigations even where Ahmedzay did not personally know the subjects of those investigations.  As we discuss in more detail below, Ahmedzay's substantial assistance includes (a) providing extensive information to law enforcement ▌▌▌▌▌▌▌▌▌▌ about al-Qaeda, (b) providing information to law enforcement related to ongoing FBI investigations, (c) testifying at three trials in the Eastern District of New York against defendants charged with serious terrorism crimes, and (d) assisting authorities of foreign governments.



9



10



### C. Direct Assistance in Prosecuting U.S. Cases

Ahmedzay has directly contributed to the prosecutions of numerous individuals by the U.S. government. Most notably, and as discussed below, he testified during three separate trials of Adis Medunjanin, Abid Naseer and Muhanad al-Farekh.

#### 1. Adis Medunjanin

Ahmedzay testified at the trial of Adis Medunjanin in April 2012 before the Honorable John Gleeson. As noted above, Medunjanin was one of Ahmedzay's co-conspirators in the effort to conduct coordinated suicide bombings in the New York City subway system.

Leading up to Medunjanin's trial, the government met with Ahmedzay extensively to prepare him for his testimony. During these meetings, the defendant was forthcoming and cooperative, and diligently worked with prosecutors and agents to prepare for trial.

At trial, Ahmedzay's testimony – along with that of his co-conspirator Najibullah Zazi – was critical. While Medunjanin conceded that he had traveled to Pakistan, and even that he had done so to join the Taliban to defend Muslims in Afghanistan, he denied that he had done so intending to kill Americans. In addition, Medunjanin argued that he returned to the United States by himself because he did not intend to be a suicide bomber, and that Ahmedzay and Zazi did not include Medunjanin when making their plans to conduct a suicide attack after returning to the United States. Thus, Ahmedzay's testimony was critical to establishing proof of Medunjanin's understanding of and participation in the conspiracy to kill American soldiers in Afghanistan and to conduct a suicide attack on the New York City subways.

Ahmedzay testified about Medunjanin's role in radicalizing him and encouraging him to pursue jihad, the origins of the agreement between Ahmedzay, Medunjanin and Zazi to travel to Pakistan to join and fight with the Taliban against American and coalition forces in Afghanistan, and their travel to Pakistan. Ahmedzay testified about his unsuccessful efforts with Medunjanin to cross the border into Afghanistan by taxi in order to join the Taliban, their subsequent successful efforts to join al-Qaeda, and the training that they received from al-Qaeda. Ahmedzay also testified about his, Zazi's and

Medunjanin's agreement in Pakistan to conduct a suicide attack in New York City, and their efforts once they had returned to the United States to commit such an attack.

Ahmedzay's testimony during Medunjanin's trial was powerful and compelling.  At trial, the jury convicted Medunjanin of all counts of conspiracy to use weapons of mass destruction, conspiracy to commit murder in a foreign country, providing material support to a foreign terrorist organization, conspiracy to provide material support to a foreign terrorist organization, receiving military-type training from a foreign terrorist organization, conspiracy to commit an act of terrorism transcending national boundaries, attempt to commit an act of terrorism transcending national boundaries, use of a firearm or destructive device during and in relation to a crime of violence, and use of a destructive device during and in relation to a crime of violence.  Judge Gleeson sentenced Medunjanin to life in prison.

2. <u>Abid Naseer</u>

Ahmedzay also testified at the trial of Abid Naseer, which took place before this Court in February and March 2015.  Working with new prosecutors, Ahmedzay met with the government extensively to prepare for his testimony.  During these meetings, Ahmedzay worked diligently with the prosecution team to prepare for his testimony.

Naseer was charged with conspiring to provide and providing material support to al-Qaeda and conspiring to use a destructive device.  A British national, Naseer was the leader of one of three al-Qaeda cells tasked by al-Qaeda external operations leadership with conducting terrorist bombings in Western countries in 2009.  Ahmedzay, Medunjanin and Zazi comprised one such cell in the United States.  Naseer's cell intended to detonate a bomb at the Arndale Center, a shopping mall in Manchester, England, during Easter week of 2009.  A third cell in Norway intended to blow up the headquarters of a newspaper in Denmark that had sponsored a cartoon contest involving the Prophet Mohammed.

Some of the primary evidence that the government presented at trial consisted of electronic mails exchanged between Naseer and an al-Qaeda operative using the email address "sana_pakhtana[@]yahoo.com."  This was the same email address that an al-Qaeda operative had used to contact Najibullah Zazi for the purpose of communicating with Zazi after he had returned to the United States.  Zazi testified about his own communications with this email address, including that he had been instructed to use a code in which references to a "wedding" meant a terrorist attack.  Naseer's own emails with the al-Qaeda courier referred to a wedding.

13

Because he had not gone to the explosives training camp which Zazi had attended, Ahmedzay was not in position to testify about email communications with al-Qaeda operatives regarding explosives. However, in describing the background evidence of his experiences with Zazi and Medunjanin joining al-Qaeda, learning weapons training, and seeking to conduct a suicide bomb attack on the New York City subway system, Ahmedzay's testimony at Naseer's trial corroborated Zazi's testimony, and therefore gave the jury an additional basis on which to credit Zazi's testimony regarding his emails with the al-Qaeda operative and the coded reference to wedding meaning a terrorist attack.

Thus, although Ahmedzay was not a direct witness to Naseer's crimes (indeed, Ahmedzay fully admitted in his testimony that he had never met Naseer and never heard anything about Naseer), Ahmedzay provided critical context and corroborated Zazi's own testimony.

Following trial, Naseer was convicted on all counts, and this Court sentenced him to 40 years' imprisonment.

### 3. Muhanad al-Farekh

Finally, Ahmedzay also testified at the trial of Muhanad al-Farekh in September 2017 before the Honorable Brian M. Cogan. Al-Farekh was charged, inter alia, with providing material support to al-Qaeda and conspiring to attack a U.S. military base in Afghanistan in 2009 using vehicle-borne improvised explosive devices. Al-Farekh, who was a U.S. citizen, had traveled to Pakistan in March 2007 with fellow University of Manitoba students Ferid Imam and Maiwand Yar. Like Ahmedzay, Medunjanin and Zazi, Farekh, Imam and Yar became radicalized listening to the sermons of Anwar al-Awlaki, traveled from North American to Pakistan, where they made their way to the FATA, ultimately joining up with al-Qaeda. Farekh later worked closely with Abdul Hafeez in al-Qaeda's external operations program.

Again working with new prosecutors, Ahmedzay met with the government extensively prior to trial. Although he was by that point understandably anxious to move forward with sentencing, Ahmedzay diligently prepared for his testimony. During the preparation, he was forthcoming and cooperative, as well as patient in working with new prosecutors who had not previously met with him.

Ahmedzay did not personally know al-Farekh nor did he offer any testimony specifically about al-Farekh. However, Ahmedzay identified Ferid Imam, who had traveled to Pakistan with al-Farekh, as Ahmedzay's al-Qaeda military weapons trainer Yousef. In

14

addition to describing the military weapons training that Yousef provided, Admedzay testified that Yousef told him that he had been in the FATA for approximately a year, consistent with Ferid Imam having traveled to the FATA with al-Farekh and Yar in early- to mid-2017.

Moreover, Ahmedzay's description of Abdul Hafeez as the most senior individual he met within al-Qaeda in 2009 corroborated other testimony that the government offered about Abdul Hafeez's leadership role within al-Qaeda's external operations program. Specifically, the government offered other testimony at trial about al-Farekh's work directly with Abdul Hafeez, and Ahmedzay's testimony was critical to establishing Abdul Hafeez's role within al-Qaeda.

In addition, Ahmedzay's testimony about his experiences crystallized for the jury in the al-Farekh trial that three men from North America with no prior connection to al-Qaeda could travel to Pakistan and join the terrorist organization.

Ahmedzay's testimony was compelling. The jury ultimately convicted al-Farekh on all nine counts with which he was charged, and Judge Cogan sentenced al-Farekh to 45 years' imprisonment.









V.      Request for Downward Departure Pursuant to Section 5K1.1

Pursuant to Section 5K1.1 of the Guidelines, the government hereby informs the Court that Ahmedzay provided substantial assistance to the government. See Melendez, 518 U.S. at 129 ("Section 5K1.1(a) may guide the district court when it selects a sentence below the statutory minimum, as well as when it selects a sentence below the Guidelines range.").

As detailed above in Section IV of this letter, the "nature and extent" of Ahmedzay's assistance has been extraordinary. See U.S.S.G. § 5K1.1(a)(3). He provided critical intelligence and unique insight regarding al-Qaeda and its members, and testified as a witness in three terrorism trials in the Eastern District of New York, leading to successful criminal prosecutions and convictions. The government respectfully submits that its evaluation of the assistance rendered by the defendant should be given significant weight in the Court's own analysis of the "significance and usefulness of the defendant's assistance." See U.S.S.G. § 5K1.1(a)(1); United States v. Rexach, 896 F.2d 710, 713 (2d Cir. 1990) ("[s]ubstantial weight should be given to the government's evaluation of the extent of the defendant's assistance").

In addition, as discussed above, the truthfulness of the information Ahmedzay provided was corroborated by numerous independent sources. See U.S.S.G. § 5K1.1(a)(2)

Ahmedzay's assistance came in the face of substantial potential danger to himself. U.S.S.G. § 5K1.1(a)(4). Terrorist organizations such as al-Qaeda have publicized the fact that they may target individuals who betray or cooperate against them. By aligning himself with the government against al-Qaeda, Ahmedzay has assumed such a risk.

Finally, Ahmedzay's assistance was timely.  See U.S.S.G. § 5K1.1(a)(5).  Although Ahmedzay initially lied to the government prior to his arrest when he first spoke to law enforcement in September 2009, Ahmedzay ultimately began cooperating with law enforcement in April 2010, sufficiently timely for him to testify against one co-defendant and to testify in additional trials years later.  Ahmedzay also continued to provide information in a timely manner as new issues and questions arose during the course of his cooperation, and to prepare for and testify at multiple trials.

VI.    Sealing

The government respectfully requests that this letter be filed under seal.  The government has prepared a redacted version of this letter for public filing, which is attached to this submission, and respectfully requests the Court's permission to file this redacted version on the public docket.

Much of the defendant's cooperation is already public, such as his testimony at multiple trials in this district, but the full extent of the information the defendant has provided is not.  In addition, the government's candid assessment of the specific ways in which the defendant's information proved valuable also is not public.



The extensive information Ahmedzay provided continues to directly contribute to ongoing law enforcement investigations related to national security matters, and revealing that information could jeopardize some of those ongoing investigations.  See, e.g., United States v. Amodeo, 44 F.3d 141, 147 (2d Cir. 1995) (need to protect the integrity of an ongoing investigation may be compelling reason justifying sealing).  Moreover, in describing the significance of the information that Ahmedzay provided, this letter provides

insight into the kinds of strategies that the government has employed and may employ in the future in investigating individuals such as the defendant, and those strategies might be compromised if the letter were made public in full.  See Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 120 (2d Cir. 2006) (interests that weigh against disclosure of judicial documents include "the danger of impairing law enforcement . . . efficiency"); Amodeo, 44 F.3d at 147 ("We have recognized the law enforcement privilege as an interest worthy of protection. . . . This privilege is designed to prevent disclosure of law enforcement techniques and procedures"); United States v. Doe, 63 F.3d 121, 128 (2d Cir. 1995) (danger to person may be compelling reason to override public's right of access in courtroom closure context).

In addition, this letter should be filed under seal so as not to reveal the full nature and extent of the defendant's cooperation.  Revealing those details will likely harm the ability of law enforcement to secure current and future cooperation from persons similarly situated to the defendant, a fact that also weighs against public disclosure.  United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995) ("If release is likely to cause persons in the particular or future cases to resist involvement where cooperation is desirable, that effect should be weighed against the presumption of access.").

Under these circumstances, the parties' countervailing interests outweigh the public's qualified right to access.  As the facts set forth above provide ample support for the "specific, on the record findings" necessary to support sealing, Lugosch, 435 F.3d at 120, the government respectfully requests that the Court record those findings and file this letter under seal.

19

VII. <u>Conclusion</u>

For the foregoing reasons, the government respectfully submits this letter to assist the Court in crafting an appropriate sentence in this case, including by apprising the Court, pursuant to Section 5K1.1 of the Guidelines, of the substantial assistance that the defendant provided to the government. Under the terms of the cooperation agreement in this matter, the government makes no recommendation to the Court for a specific sentence to be imposed.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By: _____/s/_____
Douglas M. Pravda
Assistant U.S. Attorney
(718) 254-7000

cc: Michael A. Marinaccio, Esq. (by e-mail)
Shayna Bryant, Senior United States Probation Officer (by e-mail)